**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**
**CHARLESTON DIVISION**

**GARNET ANN DAVIS,**

Plaintiff,

v.

No. 2:26-cv-316
Judge Irene C. Berger

**SAGENT PHARMACEUTICALS, INC. and McKESSON MEDICAL-SURGICAL INC.,**

Defendants.

# Plaintiff's Response in Opposition to Defendant McKesson Medical-Surgical, Inc.'s Motion to Dismiss Plaintiff's Complaint Pursuant to Rule 12(b)(6)

## I. NATURE OF THE CASE

This is a pharmaceutical product liability action arising from the distribution of a contaminated injectable corticosteroid to Plaintiff Garnet Ann Davis, a 79-year-old resident of Clay County, West Virginia. On March 28, 2024, Plaintiff received an injection of Methylprednisolone Acetate Injectable Suspension, USP ("MASI"), 40 mg/mL, at West Virginia Foot & Ankle, PLLC, a product manufactured by Defendant Sagent Pharmaceuticals, Inc. and distributed by Defendant McKesson Medical-Surgical Inc. The product was defective, containing contamination including black particulate matter, as evidenced by Sagent's subsequent recall. Plaintiff immediately developed severe infection, was hospitalized twice, underwent multiple surgical procedures, and on June 24, 2024, suffered amputation of her right great toe due to treatment-resistant osteomyelitis directly caused by the

contaminated injection. Following amputation, Plaintiff developed Complex Regional Pain Syndrome, Phantom Limb Syndrome, and Chronic Pain Syndrome, ultimately requiring trial and permanent implantation of a spinal cord stimulator. Plaintiff's medical charges exceed $156,957.56, she continues to suffer unremitting 10/10 pain, and carries an Oswestry Disability Index rating of 54% "Severe Disability." Most critically, it was not until June 25, 2024, nearly three months after the injection and after Plaintiff had already undergone amputation, that she received any notice of the recall. That notice came through a letter from Dr. Carrie Frame, DPM, informing Plaintiff that West Virginia Foot & Ankle, PLLC had received information from its supplier of MASI — McKesson Medical-Surgical Inc. — of an urgent drug recall of the specific lots administered to Plaintiff. **Exhibit 1**.

## II. INTRODUCTION

Defendant McKesson Medical-Surgical Inc. ("McKesson") asks this Court to dismiss Plaintiff Garnet Ann Davis's Complaint with prejudice before a single deposition has been taken, before a single document has been produced, and before Plaintiff has had any opportunity to develop the factual record concerning McKesson's role in placing a contaminated product into the stream of commerce and the timing of its notification to the healthcare provider who administered that product to Plaintiff. McKesson's motion should be denied for three independent reasons: (1) the motion is untimely, filed twelve days after this Court's Order and Notice deadline for 12(b) motions, over Plaintiff's explicit objection, and based on a stipulation that by its own express terms could not extend that Court-ordered

deadline; (2) the Complaint states plausible and well-pleaded claims against McKesson, and the documentary record already before the Court establishes McKesson's direct role in the recall notification chain; and (3) McKesson's substantive defenses raise factual questions that cannot properly be resolved on the pleadings and require discovery to adjudicate.

## III. MCKESSON'S MOTION IS UNTIMELY AND SHOULD BE DENIED ON PROCEDURAL GROUNDS

### A. The Court's Order and Notice Set a Firm Deadline of May 27, 2026, for All Rule 12(b) Motions.

McKesson's motion is untimely and should be denied on that basis alone. This Court's Order and Notice, entered May 7, 2026, expressly fixed May 27, 2026, as the deadline for "[m]otion[s] [u]nder FR Civ P 12(b), together with supporting briefs, memoranda, affidavits, or other such matter in support thereof." [Doc. 4]. McKesson filed its Motion to Dismiss and supporting Memorandum on June 8, 2026 [Doc. 9] — twelve days after the Court-ordered deadline. The motion is untimely on its face.

### B. Any Extension of Sagent's Answer Deadline Did Not and Could Not Extend the Court-Ordered 12(b) Deadline.

McKesson will rely on the Stipulation of Extension, filed May 11, 2026, which extended the time for McKesson to "answer or otherwise respond to the Complaint" until June 8, 2026. [Doc. 5]. That stipulation does not save McKesson's motion.

LR Civ P 12.1 provides that "the time to answer or otherwise respond to a complaint may be extended by stipulation," but expressly adds: "An extension by

stipulation will not affect other deadlines established by the Federal Rules of Civil Procedure, these Local Rules of Civil Procedure, or the court." F.R. Civ. P. 16(b)(3)(A) requires the Court's scheduling order to limit the time to "file motions," F. R. Civ. P. 16(b)(3)(A), and F.R. Civ. P. 16(b)(4) provides that such a schedule "may be modified only for good cause and with the judge's consent." F. R. Civ. P. 16(b)(4). LR Civ P 16.1(f)(1) limits modification of motion filing deadlines to "good cause by order," and LR Civ P 16.1(f)(2) expressly prohibits party stipulations from affecting those deadlines. The Court's Order and Notice is precisely the type of court-established deadline that LR Civ P 12.1 shields from modification by party stipulation. McKesson obtained no court order, demonstrated no good cause, and cannot point to any rule permitting a party to extend a judicially-mandated motion filing deadline by private agreement.

The email record further establishes beyond any doubt that Plaintiff never agreed to extend the 12(b) deadline. On June 5, 2026, McKesson's incoming counsel, Jason M. Reefer, Esq. of Pietragallo Gordon Alfano Bosick & Raspanti, LLP, sent Plaintiff's counsel an email expressly acknowledging the ambiguity: "I am still trying to determine whether there might be a basis for a Rule 12 motion based on, for example, the WV innocent seller statute. I mention this because your response referred to a deadline to 'Answer the Complaint,' which could be shorthand for 'respond to the Complaint,' but I didn't want there to be any ambiguity." **Exhibit 2**. Plaintiff's counsel responded the same day, unambiguously: "My firm policy has always been that we do not grant extensions to defendants who would like extra

time to draft and file dispositive motions against our clients. The only extensions provided are for the Answer to the Complaint to be filed. The Court, in her Order and Notice, Ordered that all 12(b) motions must be filed by May 27, 2026. This is a Court-ordered deadline I am not permitted to extend. The Order is attached. I am still happy to provide you more time to file your Answer, but cannot extend the timeframe for 12(b) motions for any defendant." **Exhibit 3** (emphasis added). McKesson filed its 12(b) motion three days later, over Plaintiff's explicit objection, in full knowledge that the Court-ordered deadline had already passed.

McKesson's motion should be denied as untimely, without reaching the merits. Courts in this district take motion deadlines established by Order and Notice seriously, and the Court's scheduling orders "d[o] not purport to allow" parties to file 12(b) motions outside their designated time. *Nitro Constr. Servs. v. Pilot Travel Ctrs.*, Civil Action No. 3:25-cv-00026, slip op. at 2-3 (S.D. W. Va. Aug. 28, 2025). Regardless of how the Court characterizes McKesson's motion, it fails on the merits for the independent reasons set forth below.

## IV. THE COMPLAINT STATES COGNIZABLE CLAIMS AGAINST MCKESSON, AND DISMISSAL ON THE MERITS IS NOT WARRANTED

### A. Legal Standard.

To survive a Rule 12(b)(6) motion, a complaint need only plead facts sufficient "to state a claim for relief that is plausible on its face." *Canterbury v. FCA US LLC*, No. 2:21-cv-17, 2021 WL 1032307, at *1 (S.D. W. Va. Mar. 17, 2021). "[W]e accept as true all well-pled facts in the complaint and construe them in the light most

favorable to [plaintiff]." *SD3, LLC v. Black & Decker (U.S.) Inc.*, 801 F.3d 412, 422 (4th Cir. 2015). Courts must not weigh competing inferences or confuse plausibility with probability. As the Fourth Circuit warned in *SD3*: "When a court confuses probability and plausibility, it inevitably begins weighing the competing inferences that can be drawn from the complaint. But it is not our task at the motion-to-dismiss stage to determine 'whether a lawful alternative explanation appear[s] more likely' from the facts of the complaint." *SD3*, 801 F.3d at 425. As this Court has recognized, a plaintiff is not required to "'forecast' evidence sufficient to prove the elements of the claim," and the plausibility standard "requires only that the complaint's factual allegations 'be enough to raise a right to relief above the speculative level.'" *Raab v. Smith & Nephew, Inc.*, 150 F. Supp. 3d 671, 681 (S.D. W. Va. 2015).

**B. The Complaint Is Not a Prohibited Shotgun Pleading**.

McKesson argues the Complaint constitutes an impermissible "shotgun pleading" because counts are directed at "Defendants" collectively. [Doc. 10, page 2]. This argument fails.

The Fourth Circuit's concern in *SD3* was with corporate parents and affiliates against whom "no factual allegations are made" at all — entities "unlucky enough to be a bystander to its sister company's alleged misdeeds." *SD3*, 801 F.3d at 423. McKesson is not a bystander. The Complaint identifies McKesson by name and specifically identifies its role: McKesson "was engaged in the business of supplying, marketing, promoting, selling and distributing pharmaceutical and

medical products throughout the United States, including West Virginia, and was the distributor of the Methylprednisolone Acetate Injectable Suspension, USP manufactured by Sagent that was administered to Plaintiff." The Complaint further alleges that "[t]he product, as manufactured by Sagent and distributed by McKesson, reached Plaintiff without substantial change in its condition from the time it entered the stream of commerce" — a direct and product-specific allegation against McKesson as the distributor who placed the defective product into the chain of commerce. As this Court recognized in *Ashworth v. Albers Med., Inc.*, 395 F. Supp. 2d 395, 404 (S.D.W. Va. 2005), "West Virginia Supreme Court of Appeals recognizes under the common law that all of those in the chain of distribution, regardless of guilt, may be found liable," in furtherance of "the public policy that an injured party not have to bear the cost of his injuries simply because the manufacturer is out of reach."

If any pleading imprecision exists, the proper remedy is not dismissal with prejudice but leave to amend or a motion for a more definite statement. F.R. Civ. P. 15(a)(2) provides that the "court should freely give leave [to amend] when justice so requires." F. R. Civ. P. 15(a)(2). F.R. Civ. P. 12(e) provides the alternative remedy of a motion for a more definite statement where a pleading is "so vague or ambiguous that the party cannot reasonably prepare a response." F. R. Civ. P. 12(e). McKesson sought neither — it sought dismissal with prejudice, which is neither required nor appropriate here.

### C. West Virginia's Innocent Seller Statute Does Not Bar Plaintiff's Claims.

McKesson's principal argument is that W. Va. Code § 55-7-31 bars all of Plaintiff's claims. [Doc. 10, pages 5-9]. This argument fails because the documentary record already before the Court demonstrates that at least three statutory exceptions apply — and because the full factual predicate for those exceptions requires discovery that has not yet occurred.

#### 1. Canterbury Is Distinguishable in the Most Critical Respect.

McKesson relies primarily on *Canterbury v. FCA US LLC*, No. 2:21-cv-17, 2021 WL 1032307 (S.D. W. Va. Mar. 17, 2021), for the proposition that failure to plead an enumerated exception mandates dismissal. [Doc. 10, page 5]. *Canterbury* is plainly distinguishable.

In *Canterbury*, the Court dismissed the seller (Dutch Miller automobile dealership) because "[o]f these exceptions, Plaintiff has not alleged that any apply to Dutch Miller" and critically, the plaintiff had not responded to the motion at all, indicating abandonment of the claims. *Canterbury*, 2021 WL 1032307, at *2-3. There was no documentary evidence before the court establishing that the dealership had any knowledge of the vehicle defect. The entire basis for dismissal was that "Plaintiff has not pled that any exception applies." *Id.*

Here, Plaintiff has specifically alleged that McKesson had or should have had actual knowledge of the defect, and the documentary record already before the Court — **Exhibit 1** — establishes that McKesson was itself the entity that

communicated the recall notification directly to Dr. Frame's office. As **Exhibit 1** establishes, West Virginia Foot & Ankle, PLLC received information from "our supplier of Methylprednisolone Acetate Injectable Suspension, USP, that being McKesson Medical-Surgical Inc., of an urgent drug recall regarding specific lots of this injectable which were manufactured by Sagent Pharmaceuticals and distributed by McKesson." **Exhibit 1**. This is not a case of a passive seller with no connection to the defect. McKesson was an active participant in the recall notification chain. Canterbury does not govern here.

### 2. The Actual Knowledge Exception (§ 55-7-31(b)(1)) Is Plausibly Alleged and Supported by the Record.

W. Va. Code § 55-7-31(b)(1) provides that a product liability action may proceed against a seller where "[t]he seller had actual knowledge of the defect in the product that was a proximate cause of the harm for which recovery is sought." McKesson argues the Complaint contains only "threadbare, boilerplate" allegations of knowledge. [Doc. 10, page 7]. That characterization ignores the documentary record.

**Exhibit 1** establishes that Dr. Frame's office received information directly from McKesson of an urgent drug recall of specific lots of MASI manufactured by Sagent, specifically advising Plaintiff that she "may have been given one of the affected injections." **Exhibit 1**. McKesson was not merely a passive conduit. McKesson was the supplier that proactively communicated the recall to Dr. Frame's office. This direct communication raises questions answerable only through

discovery: When did Sagent notify McKesson of the defect? What did McKesson know, and when? Did McKesson have any pre-recall information suggesting a quality problem with these lots? How long did McKesson wait before notifying Dr. Frame after receiving recall information from Sagent?

The Complaint alleges that Sagent initiated the recall on April 25, 2024, nearly a month after Plaintiff's March 28, 2024 injection, and that Plaintiff did not receive notice until June 25, 2024, nearly three months after her injection and after she had already undergone amputation. The gap between recall initiation and patient notification, communicated through McKesson to Dr. Frame to Plaintiff, is precisely the kind of conduct that discovery will illuminate. Plaintiff has pleaded sufficient facts to raise a plausible inference that McKesson had, at a minimum, actual knowledge of the defect as of April 25, 2024, and that the timing of its communication to Dr. Frame is a subject of legitimate factual inquiry.

#### 3. Additional Exceptions Under § 55-7-31(b)(6) and (b)(7) Are Also Plausibly Alleged.

W. Va. Code § 55-7-31(b)(6) provides that a product liability action may proceed against a seller where "[t]he seller failed to exercise reasonable and product-appropriate care in assembling, maintaining, storing, transporting or repairing the product and such failure was a proximate cause of the harm for which recovery is sought." Section 55-7-31(b)(7) further provides for seller liability where "[t]he seller removed or failed to convey to the user or consumer of the product the

manufacturer's labels, warnings or instructions and such failure was a proximate cause of the harm for which recovery is sought."

Both exceptions are implicated here. Whether McKesson timely conveyed the manufacturer's recall information to Dr. Frame's office is, by definition, a question bearing on both subsections. If McKesson received notice from Sagent in late April 2024 but delayed notification to Dr. Frame — resulting in Dr. Frame's notice to Plaintiff not arriving until June 25, 2024, after the amputation — that delay may constitute both a failure to exercise reasonable care and a failure to timely convey the manufacturer's warnings. These are factual questions that cannot be resolved on the pleadings and require discovery into the timing of McKesson's internal communications, its recall-handling protocols, and the precise sequence of events between Sagent's April 25, 2024 recall and McKesson's contact with Dr. Frame.

### D. McKesson's Preemption Argument Does Not Bar Plaintiff's Claims.

#### 1. *Mensing* and *Drager* Are Limited to Generic Drug Manufacturers and Do Not Control a Distributor's Liability.

McKesson relies heavily on *Drager v. PLIVA USA, Inc.*, 741 F.3d 470 (4th Cir. 2014), and *PLIVA, Inc. v. Mensing*, 564 U.S. 604 (2011). [Doc. 10, pages 3-5, 10-12]. Neither case controls the claims at issue here.

*Drager* involved a generic drug manufacturer (PLIVA) required by the FDA to maintain label equivalence to the brand-name product and therefore unable to unilaterally change its labeling. *Drager*, 741 F.3d at 474-76. The Fourth Circuit

affirmed preemption because "[t]ogether, these cases establish that under the FDCA a generic may not unilaterally change its labeling or change its design or formulation, and cannot be required to exit the market or accept state tort liability." *Id*. at 476. *Mensing* held that federal drug regulations "prevented the Manufacturers from independently changing their generic drugs' safety labels," making "it ... impossible for the Manufacturers to comply with both their state-law duty to change the label and their federal law duty to keep the label the same." *PLIVA, Inc. v. Mensing*, 131 S. Ct. 2567, 2577-78 (2011).

McKesson is not a manufacturer. It holds no NDA or ANDA. It has no FDA obligation to maintain label equivalence. The impossibility rationale that drove Drager and Mensing simply does not apply to a distributor. Nothing in federal law prevented McKesson from immediately contacting Dr. Frame's office the moment it received Sagent's recall notice. Nothing in federal law required McKesson to wait weeks before passing along a recall notification already issued by the manufacturer. A claim that McKesson failed to act reasonably in the recall notification chain is not a claim that requires McKesson to unilaterally change a drug label — it is a claim about McKesson's own conduct in the distribution chain after it received recall information. That conduct is not preempted.

**2. Count I: Strict Liability Manufacturing Defect, is Not Preempted.**

McKesson's preemption argument, even taken at face value, reaches only failure-to-warn claims premised on labeling obligations. It cannot reach Count I —

strict liability for manufacturing defect. *Drager* itself articulated the strict liability manufacturing defect standard as requiring the plaintiff to establish "(1) the product was in defective condition at the time that it left the possession or control of the seller, (2) that it was unreasonably dangerous to the user or consumer, (3) that the defect was a cause of the injuries, and (4) that the product was expected to and did reach the consumer without substantial change in its condition." *Drager*, 741 F.3d at 477. Plaintiff's Complaint alleges precisely these elements: the MASI product "was defective in that it deviated from its intended specifications, contained contamination including particulate matter, and was otherwise adulterated or impure, as evidenced by Sagent's own subsequent recall of the product," and "[t]he product, as manufactured by Sagent and distributed by McKesson, reached Plaintiff without substantial change in its condition from the time it entered the stream of commerce." These allegations go to the condition of the product — not to any labeling obligation. A distributor who places a defective product in the stream of commerce may be held liable for that defective product independently of any labeling claim.

### E. The Learned Intermediary Doctrine Does Not Discharge McKesson's Obligations.

McKesson argues that the learned intermediary doctrine discharges any duty to warn because that duty runs only to the prescribing physician. [Doc. 10, pages 10-11]. This argument fails.

As this Court held in *Ashworth v. Albers Med., Inc.*, 395 F. Supp. 2d 395, 408 (S.D.W. Va. 2005), the learned intermediary doctrine "applies to discharge any duty ... absent the allegation that the pharmacy had knowledge of either the counterfeit scheme or the existence of such counterfeit drugs in the distribution system at the time of the purchase." In *Ashworth*, the doctrine was applied to discharge Rite Aid's duty because "[t]here is no allegation that Rite Aid knew or should have known that the Lipitor sold to the plaintiff was counterfeit whether by observing the tablets or the bottles in which the tablets came." *Ashworth*, 395 F. Supp. 2d at 407-08.

Here, the opposite is true. **Exhibit 1** establishes that McKesson had specific, actual knowledge of the recall and the defective lots, and McKesson directly communicated that knowledge to Dr. Frame's office. **Exhibit 1**. The question the learned intermediary doctrine does not answer, and that discovery must answer, is when McKesson received that information and when it chose to communicate it. The learned intermediary doctrine protects a seller who lacks knowledge. It does not immunize a seller who had knowledge and whose handling of that knowledge is the very subject of the lawsuit. As *Ashworth* recognized, "all of those in the chain of distribution, regardless of guilt, may be found liable" under West Virginia common law. *Id*. at 404.

### F. Plaintiff States a Plausible Negligence Claim Against McKesson.

McKesson argues that Count III fails because it does not mention McKesson by name. [Doc. 10, page 9]. This is a textual argument that elevates form over substance. The Complaint incorporates all preceding paragraphs into Count III, and those paragraphs extensively allege McKesson's role as distributor and its participation in the recall notification chain. McKesson itself concedes that "Count III does not so much as mention McKesson by name, let alone provide any factual background sufficient to put McKesson on notice of the allegations against it." [Doc. 10, page 9]. If this is the identified deficiency, leave to amend to add McKesson's name and specific conduct allegations to Count III is the appropriate remedy — not dismissal with prejudice. F.R. Civ. P. 15(a)(2) requires that the "court should freely give leave [to amend] when justice so requires," F. R. Civ. P. 15(a)(2), and F.R. Civ. P. 12(e) provides the alternative remedy of a motion for a more definite statement. F. R. Civ. P. 12(e). Where a count can be cured by amendment, dismissal with prejudice is neither required nor appropriate.

As to the preemption and learned intermediary arguments directed at Count III: for the reasons set forth in Sections IV.D and IV.E above, those arguments do not reach McKesson's conduct in the recall notification chain, which is the conduct at the core of this case.

**G. Plaintiff's Negligence Per Se Claim**.

Plaintiff does not contest that a freestanding private right of action does not exist under the FDCA. The regulatory standards under the FDCA remain relevant

to establish the standard of care for negligence purposes. Plaintiff requests leave to amend Count IV to clarify this theory if the Court identifies a deficiency.

### H. Plaintiff's Warranty Claims Warrant Discovery Before Dismissal.

The Complaint alleges that "Defendants expressly and impliedly warranted that the Methylprednisolone Acetate Injectable Suspension, USP was sterile, safe, and reasonably fit and suitable for its intended purpose." The distribution agreement between McKesson and Sagent, McKesson's representations to Dr. Frame's practice regarding the product, and the commercial relationship through which McKesson supplied the product are all factual matters subject to discovery. Before any such discovery, the Court cannot determine as a matter of law that McKesson made no representations.

As to preemption: *Drager's* preemption holding rests entirely on the impossibility facing a generic drug manufacturer that "cannot satisfy a state law duty except by ... changing its warnings, changing its formulation, exiting the market, or accepting tort liability." *Drager*, 741 F.3d at 477. McKesson is a distributor. It holds no NDA or ANDA, bears no FDA obligation to maintain label equivalence, and faces none of the impossibility that drove *Drager*. A warranty claim premised on McKesson's distribution of a product it knew or should have known was defective, and its handling of the recall notification chain, does not require McKesson to alter any label or formulation. *Drager* does not support preemption of warranty claims against McKesson.

## V. WEST VIRGINIA'S FAULT-ALLOCATION STATUTE REQUIRES MCKESSON TO REMAIN IN THIS ACTION

W. Va. Code § 55-7-13D(a)(1) provides that "[i]n assessing percentages of fault, the trier of fact shall consider the fault of all persons who contributed to the alleged damages regardless of whether the person was or could have been named as a party to the suit." Section 55-7-13D(a)(3) further provides that "[i]n all instances where a nonparty is assessed a percentage of fault, any recovery by a plaintiff shall be reduced in proportion to the percentage of fault chargeable to such nonparty." Section 55-7-13D(a)(2) provides that fault of a nonparty shall be considered if "a defending party gives notice no later than one hundred eighty days after service of process upon said defendant that a nonparty was wholly or partially at fault." If McKesson is dismissed from this action, Sagent will almost certainly seek to designate McKesson as a nonparty at fault, thereby reducing Plaintiff's recovery by the proportion of fault assigned to McKesson without McKesson being subject to any corresponding judgment. The Legislature's purpose in enacting § 55-7-13D is best served by keeping McKesson in this action and permitting the trier of fact to properly allocate fault among all parties after full discovery.

## VI. IF ANY DEFICIENCY EXISTS IN THE COMPLAINT, PLAINTIFF SHOULD BE GRANTED LEAVE TO AMEND

In the event the Court identifies any pleading deficiency as to McKesson, Plaintiff respectfully requests leave to amend pursuant to F.R. Civ. P. 15(a)(2), which requires that the "court should freely give leave [to amend] when justice so requires." F. R. Civ. P. 15(a)(2). "This liberal rule gives effect to the federal policy in

favor of resolving cases on their merits instead of disposing of them on technicalities," and the Fourth Circuit has made clear that "leave to amend a pleading should be denied only when the amendment would be prejudicial to the opposing party, there has been bad faith on the part of the moving party, or the amendment would have been futile." *Laber v. Harvey*, 438 F.3d 404, 426-27 (4th Cir. 2006) (en banc). Indeed, "a district court should not dismiss a complaint with prejudice under [F.R. Civ. P.] 12(b)(6) without first giving the plaintiff leave to amend." Id. at 427 (citing *Ostrzenski v. Seigel*, 177 F.3d 245, 252-53 (4th Cir. 1999)). None of the conditions warranting denial — prejudice, bad faith, or futility — exists here. The Court's Order and Notice expressly preserves the right to amend, stating that "[t]he provision of FR Civ P 14 and 15 with respect to the time in which to file third-party claims and to amend pleadings without leave of court are not affected by this Order and Notice." [Doc. 4]. Dismissal with prejudice [Doc. 9] before discovery has commenced and before Plaintiff has had any opportunity to develop the specific facts concerning McKesson's internal knowledge and conduct regarding the recall would be a manifestly unjust result.

## VII. CONCLUSION

For the foregoing reasons, Plaintiff Garnet Ann Davis respectfully requests that this Court DENY Defendant McKesson Medical-Surgical Inc.'s Motion to Dismiss in its entirety. [Doc. 9]. McKesson's motion was filed twelve days after the Court's deadline, over Plaintiff's explicit objection, and based on a stipulation that by its express terms and under LR Civ P 12.1 could not extend the Court-ordered

12(b) deadline. On the merits, the Complaint states cognizable claims against McKesson as the distributor of the contaminated product; the Innocent Seller Statute's actual knowledge exception is supported by documentary evidence already of record; and the factual record concerning McKesson's conduct in the recall notification chain has not been developed through discovery. In the alternative, should the Court identify any pleading deficiency, Plaintiff requests leave to amend. F. R. Civ. P. 15(a)(2).

Respectfully submitted,

Jordan M. Laird, Esq. (#12448)
**LAIRD LAW, PLLC**
2 22nd Street, Suite 202
Wheeling, WV 26003
Phone: (304) 551-2800
Email: jordan@laird-law.com

*/s/ George Sidiropolis*
George Sidiropolis (W. Va. Bar No. 10391)
**THE INJURY RIGHTS LAW FIRM, PLLC**
1140 Main Street, 4th Floor
Wheeling, WV 26003
Phone: (304) 233-7766
Email: george@injuryrightsfirm.com

***Counsel for the Plaintiff***

**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**
**CHARLESTON DIVISION**

**GARNET ANN DAVIS,**

Plaintiff,

v.

No. 2:26-cv-316
Judge Irene C. Berger

**SAGENT PHARMACEUTICALS, INC. and McKESSON MEDICAL-SURGICAL INC.,**

Defendants.

## Certificate of Service

Undersigned counsel certifies that a true and correct copy of the foregoing ***Plaintiff's Response in Opposition to Defendant McKesson Medical-Surgical, Inc.'s Motion to Dismiss Plaintiff's Complaint Pursuant to Rule 12(b)(6)*** has been served upon all parties of record, through counsel, via the Court's electronic filing system, on this day.

Respectfully submitted,

*/s/ George Sidiropolis*

George Sidiropolis (W. Va. Bar No. 10391)
**THE INJURY RIGHTS LAW FIRM, PLLC**
1140 Main Street, 4th Floor
Wheeling, WV 26003
Phone: (304) 233-7766
Email: george@injuryrightsfirm.com

***Counsel for the Plaintiff***